IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WASHINGTON FEDERAL SAVINGS & LOAN ASSOCIATION, a federal association, | ) ) ) ) | No. 68178-8-I |
| | ) | DIVISION ONE |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| MARK A. MCNAUGHTON and MARNA L. MCNAUGHTON, husband and wife, individually and the marital community comprised thereof, | ) ) ) ) ) ) | |
| Appellants. | ) ) | FILED: May 19, 2014 |

SCHINDLER, J. — Real estate developers Mark A. and Marna L. McNaughton own

The McNaughton Group LLC (TMG). Mark McNaughton signed a promissory note on

behalf of TMG for an $11.7 million commercial loan. The note was secured by a deed

of trust on two parcels of property owned by TMG. Mark and Marna McNaughton each

personally guaranteed payment of the $11.7 million debt to the bank. Following the

default on the promissory note and a nonjudicial foreclosure sale of the properties, the

bank filed an action for a deficiency judgment against the McNaughtons as the

guarantors of the debt. As an affirmative defense, the McNaughtons requested the

court determine the "fair value for the property sold at the trustee's sale" under RCW

61.24.100(5) of the "Deeds of Trust Act," chapter 61.24 RCW. The court granted the

bank's motion for summary judgment and entered a judgment against the McNaughtons for the remaining amount owed on the debt plus interest and attorney fees and costs. On appeal, the McNaughtons argue the bank did not meet its burden on summary judgment of establishing the fair value of the properties sold at the nonjudicial foreclosure sale. The McNaughtons assert the appraisals the bank relied on to make a bid at the nonjudicial foreclosure sale did not analyze "fair value" or take into account the factors to determine an "upset price" under RCW 61.12.060 of the "Foreclosure of Real Estate Mortgages and Personal Property Liens Act," chapter 61.12 RCW. In the alternative, the McNaughtons argue material issues of fact preclude summary judgment. Because the McNaughtons' arguments ignore the plain language of the Deeds of Trust Act and the well-established burden of proof on summary judgment, we affirm.

FACTS

The material facts are not in dispute. Mark A. McNaughton and Marna L. McNaughton are real estate developers and the sole owners of The McNaughton Group LLC (TMG). In 2005, TMG borrowed $7 million from Horizon Bank and signed a "Business Loan Agreement." In 2007, the loan amount was increased to $11.7 million, and TMG signed a "Modification of Business Loan Agreement." Mark McNaughton on behalf of TMG executed a promissory note for $11.7 million plus interest at 8 percent. Under the terms of the promissory note, TMG agreed to make monthly payments to Horizon Bank and pay the outstanding amount due on or before July 31, 2009. To secure the promissory note, TMG executed and delivered a "Construction Deed of Trust" on two parcels of property owned by TMG, the preliminary plat of "Sommerwood" and the preliminary plat of "King's Corner."

2

Mark and Marna McNaughton also each executed a "Commercial Guaranty." The McNaughtons each "unconditionally guarantee[ ]" to pay the promissory note. In November 2008, TMG defaulted on the promissory note, and the McNaughtons did not honor the guaranties.

Horizon Bank retained John Bryan and Michael McMahon of the Columbia Valuation Group Incorporated to appraise the Sommerwood and King's Corner properties. The Columbia Valuation Group appraised the preliminary plat of Sommerwood with a market value of $4,115,000 as of April 24, 2009. The Sommerwood appraisal identifies 12 comparable properties that had recently sold or were listed for sale. The Columbia Valuation Group appraised the preliminary plat of King's Corner with a market value of $930,000 as of June 1, 2009. The King's Corner appraisal identifies 6 comparable properties that had recently sold or were listed for sale. The total appraised value of the 2 properties was $5,045,000.

On June 5, 2009, the trustee initiated a nonjudicial foreclosure proceeding of the Sommerwood and King's Corner properties. The trustee sent a "Notice of Foreclosure" (Notice) to TMG and the McNaughtons. The Notice states that unless the default is cured, the property will be sold on September 18, 2009. The Notice also states that as the guarantors of a commercial loan, the failure of the McNaughtons to cure the default and pay the debt by September 7 may result in "a deficiency judgment to the extent the sale price obtained at the trustee's sale is less than the debt secured by the deed of trust." As of September 7, the balance owing on the promissory note was $12,133,225 plus attorney fees and costs. Neither TMG nor the McNaughtons made any effort to cure the default.

3

Horizon Bank purchased the Sommerwood property and King's Corner property at the trustee's sale on September 18 with a bid of $6 million.[1] The trustee conveyed the properties to Horizon Bank. After Horizon Bank failed, the Federal Deposit Insurance Corporation assigned the bank's interest in the promissory note to secure the commercial loan, the deeds of trust on the two properties, and the commercial guaranties executed by the McNaughtons to Washington Federal Savings & Loan Association (Washington Federal).

At the request of Washington Federal, the Columbia Valuation Group prepared another appraisal of the Sommerwood and King's Corner properties. The appraisal concluded that the market value of the two properties as of June 10, 2010 was $5.1 million.

On June 21, 2010, Washington Federal filed a "Complaint for Monies Due" against Mark and Marna McNaughton as the guarantors of the remaining amount owed under the promissory note. Washington Federal sought a judgment of $6,133,255 plus accrued interest and attorney fees and costs.

The McNaughtons filed an answer admitting TMG defaulted on the promissory note and "they defaulted on the terms of the Guarantees." The McNaughtons asserted a number of affirmative defenses, including the statutory defense that the $6 million bid at the foreclosure sale did not "properly account for the fair value of the property." The McNaughtons requested the court "determine the fair value for the property sold at the trustee's sale, pursuant to RCW 61.24.100(5)."

---

[1] A "trustee's sale" is defined as "a nonjudicial sale under a deed of trust." RCW 61.24.005(17).

4

On December 30, 2010, Washington Federal filed a declaratory judgment action against TMG and the Silver Lake Water and Sewer District (District) to determine whether it was entitled to payments under a "Latecomers Agreement" that TMG and the District entered into on October 7, 2009. As part of the Latecomers Agreement, the District agreed to reimburse TMG with the latecomers fees for the cost of constructing a sewer lift facility to serve the preliminary plat of Sommerwood and other subdivisions.[2]

In April 2011, the McNaughtons served answers to interrogatories and requests for production propounded by Washington Federal. In response to the interrogatory requesting identification of the "fair value" of the properties and the request to "[d]escribe with specificity" all facts in support of the affirmative defense that the nonjudicial foreclosure sale did not "properly account for the fair value of the property," the McNaughtons state they are "in the process of identifying an expert witness with respect to the valuation" of the properties.

Approximately four months later, Washington Federal filed a motion for summary judgment. Washington Federal argued there was no dispute TMG defaulted on the loan, the McNaughtons did not honor the commercial guaranties, and Washington Federal was entitled to a deficiency judgment for the remaining amount owed on the promissory note. Washington Federal also argued the McNaughtons had not produced "any evidence to suggest that the Property was (or is) worth more than the amount bid at the sale." In support, Washington Federal submitted the responses to "Plaintiff's First Interrogatories and Requests for Production to Defendants Mark A. McNaughton and

---

[2] See RCW 57.22.020.

5

Marna L. McNaughton." In addition, Washington Federal submitted the 2009 and 2010 appraisals for the Sommerwood and King's Corner properties.

The McNaughtons filed a CR 56(f) motion to continue the summary judgment hearing. The McNaughtons asserted they needed additional time to obtain expert testimony on the "affirmative defense with respect to the fair value of the Property." The McNaughtons also argued the amount of the judgment could not be determined until resolution of the declaratory judgment action on latecomers fees.

In support of the motion for a continuance, the McNaughtons submitted a four-page declaration from certified real estate appraiser Anthony Gibbons. Gibbons states that he was retained on June 24, 2011 to evaluate and review the appraisals on the Sommerwood and King's Corner properties. Gibbons states that after an initial review of the April 2009 appraisal of the Sommerwood property and the June 2009 appraisal of the King's Corner property, his "preliminary opinion is that Appraisals do not accurately value the Property as of the date of the trustee's sale." Gibbons cites a number of reasons for his preliminary opinion, including the failure of the appraisals to use "the correct effective valuation date" or to "recognize the value of any latecomers' fees due to TMG regarding the lift station that TMG built on the Sommerwood portion of the Property under the Latecomers' Agreement." Gibbons also states that "the $6,000,000 credit bid at the foreclosure sale in September 2009 may not represent the 'Fair Value' of the Property under 'normal' market conditions due to the extraordinary economic conditions beginning in late 2008 and continuing into 2009." However, Gibbon states that because "[t]his opinion is based on my preliminary review of the Appraisals," he "will need to conduct additional analysis and data gathering, including investigation of

6

additional comparable sales, in order to provide a final opinion." The court granted the motion to continue the summary judgment hearing to December 7.

On November 3, Washington Federal deposed Gibbons. Gibbons testified that since signing his declaration on August 19, he had not conducted any "additional analyses" or "independent research," nor had he "gathered any additional data." Gibbons also testified that he did not know whether there were comparable sales that the 2009 appraisals failed to consider, or whether the $6 million bid at the nonjudicial foreclosure represented the fair value of the property. Gibbons stated, "I don't know. I have no basis for saying whether it would or wouldn't be, except that I haven't done the evaluation of the property at that time."

Washington Federal filed an amended motion for summary judgment arguing the McNaughtons had produced no evidence in support of the affirmative defense that the "fair value" of the property exceeds the $6 million bid at the nonjudicial foreclosure. Washington Federal submitted excerpts of the deposition of Gibbons and a declaration from certified appraiser John Bryan. Bryan states that the "market value" of the property in the 2009 and 2010 appraisals was "materially the same" as the value of the property on the date of the nonjudicial foreclosure sale. Washington Federal also submitted evidence showing the bank sold the Sommerwood property for $4 million in 2011.

In opposition, the McNaughtons argued that the 2009 and 2010 appraisals of the two properties used a "market value" rather than a "fair value" analysis and did not take into account the distressed economy. The McNaughtons also argued that because the value of the sewer facilities on the property was excluded from the 2009 and 2010 appraisals, material issues of fact precluded summary judgment. In addition, the

7

McNaughtons claimed the appraisals did not consider the sale of "Bear Creek Highlands" as a "key" comparable in the Sommerwood appraisal, and that appraisals from two other properties showed the value of the property was greater than $6 million. The McNaughtons submitted the deposition of Gibbons, a declaration from Mark McNaughton attaching appraisals for Bear Creek Highlands and three other properties, and internal Horizon Bank documents. The Horizon Bank documents included an estimated value of $3 million for construction of the sewer lift, and a notation that "the volatile real estate markets render the valuation process extremely difficult."[3]

In reply, Washington Federal filed a supplemental declaration from Bryan stating that "[t]he fair value definition contained in RCW 61.24.005[(6)] is consistent with the market value definition contained in the appraisals that Columbia Valuation Group conducted of the Property."[4] Bryan explains that a "sales comparison method" means considering sales of comparable properties and making adjustments "based on the date of sale, the size of the property, the best use of the property, and other characteristics of the property." Because there was a "dearth of sales in 2009," Bryan states the Columbia Valuation Group was "forced to use comparable sales that pre-dated the

---

[3] (Emphasis omitted.)

[4] The 2009 appraisals define "market value" as:

[T]he most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, and knowledgably, and assuming the price is not affected by unique stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated
2.  Both parties are well informed or well advised, and both acting in what they consider their own best interest
3.  A reasonable time is allowed for exposure in the open market
4.  Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto
5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Emphasis omitted.)

8

collapse of the real estate market" and make adjustments based on "the date of the sales of the comparable properties and the inflated economic market at the time of certain sales." Bryan also states that he did not use the Bear Creek Highlands property as a comparable sale "because the Bear Creek Highlands Property buyer did not plan to develop lots or homes on the property."

The court granted the motion for summary judgment and entered judgment against the McNaughtons for $6,133,225 plus prejudgment interest and reasonable attorney fees and costs. The order also states that the judgment "shall be reduced by any amounts unconditionally paid to Washington Federal by the [District] pursuant to that certain Latecomers Agreement between the District and The McNaughton Group."[5]

## ANALYSIS

The McNaughtons contend Washington Federal did not carry its burden on summary judgment to establish the "fair value" of the property sold at the nonjudicial foreclosure. The McNaughtons assert the 2009 and 2010 appraisals do not analyze "fair value" as defined by the Deeds of Trust Act, RCW 61.24.005(6), or take into

---

[5] The "Order Granting Washington Federal's Amended Motion for Summary Judgment" states, in pertinent part:

    1.    That Washington Federal is awarded a judgment against Defendants in the principal amount of $6,133,225.00, plus prejudgment interest in the amount of $1,070,820.07 through the date of judgment.

    2.    That Washington Federal's judgment shall be reduced by any amounts unconditionally paid to Washington Federal by the Silver Lake Water and Sewer District (the "District") pursuant to that certain Latecomers Agreement between the District and The McNaughton Group, LLC, dated October 7, 2009, and Plaintiff will file a partial satisfaction of judgment reflecting receipt of any such payments.

    3.    That Washington Federal have and recover judgment against Defendants for its reasonable attorneys' fees, costs, and foreclosure expenses in an amount to be determined by subsequent motion.

    4.    That the entire Judgment in the amount of $7,204,045.07 shall bear interest at the statutory rate of 12% per annum on the declining balance from the date of judgment until fully paid.

In May 2012, the court dismissed the declaratory judgment action filed by Washington Federal against TMG and the District. On appeal, we affirmed. Wash. Fed. Sav. & Loan Ass'n v. McNaughton Grp., ___ Wn. App. ___, 319 P.3d 805 (2014).

9

account the factors for determining an "upset price" under RCW 61.12.060 of the Foreclosure of Real Estate Mortgages Act. The McNaughtons' arguments are not supported by the plain language of the Deeds of Trust Act, chapter 61.24 RCW, or the well-established burden of proof on summary judgment.

Interpretation of a statute is a question of law that we review de novo. City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009). This court's objective is to determine the legislature's intent. Rothwell, 166 Wn.2d at 876. Statutory interpretation begins with the statute's plain meaning. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). The "plain meaning" of a statute is discerned from the ordinary meaning of the language at issue as well as the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole. Lake, 169 Wn.2d at 526. "While we look to the broader statutory context for guidance, we 'must not add words where the legislature has chosen not to include them,' and we must 'construe statutes such that all of the language is given effect.' " Lake, 169 Wn.2d at 526 (quoting Rest. Dev., Inc. v. Canawill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003)). "Where the language of a statute is clear, legislative intent is derived from the language of the statute alone." Rothwell, 166 Wn.2d at 876. If the statute is unambiguous, the inquiry ends. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

The legislature enacted the Deeds of Trust Act in 1965 to allow nonjudicial foreclosure of deeds of trust. LAWS OF 1965, ch. 74, § 1. The Deeds of Trust Act was designed " 'to avoid time-consuming judicial foreclosure proceedings and to save substantial time and money to both the buyer and the lender.' " Wash. Fed. v. Gentry,

___Wn. App. ___, 319 P.3d 823, 826-27 (2014) (quoting Peoples Nat'l Bank of Wash. v. Ostrander, 6 Wn. App. 28, 31, 491 P.2d 1058 (1971) (citing John A. Gose, The Trust Deed Act in Washington, 41 WASH. L. REV. 94 (1966))). As our supreme court recently noted, nonjudicial foreclosure "provides a comparatively inexpensive and fast mechanism for the lending industry to foreclose on property pledged as security for a debt through a nonjudicial foreclosure action." Schroeder v. Excelsior Mgmt. Grp., LLC, 177 Wn.2d 94, 98, 297 P.3d 677 (2013).

When enacted in 1965, the Deeds of Trust Act barred a deficiency judgment on the obligation secured by the foreclosed deed of trust. LAWS OF 1965, ch. 74, § 10. The court in Donovick v. Seattle-First National Bank, 111 Wn.2d 413, 416, 757 P.2d 1378 (1988), explained that "[r]eading the entirety of [the Deeds of Trust Act] in the context of the mortgage laws and the history of deed of trust legislation, it is apparent" borrowers agreed to relinquish the statutory right to redeem the property after a foreclosure sale, and lenders agreed to relinquish the right to seek a deficiency judgment on a foreclosed deed of trust.

In 1998, the legislature adopted extensive changes to the Deeds of Trust Act provision governing deficiency judgments. See LAWS OF 1998, ch. 295, § 12. The legislature retained the bar against obtaining a deficiency judgment on the obligation secured by the foreclosed deed of trust but adopted an exception "for deeds of trust securing commercial loans." RCW 61.24.100(1). RCW 61.24.100(1) states:

> Except to the extent permitted in this section for deeds of trust securing commercial loans, a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower, grantor, or guarantor after a trustee's sale under that deed of trust.

RCW 61.24.100(3)(c) permits an action for a deficiency judgment against the guarantor where a deed of trust secures a commercial loan executed after June 11, 1998. RCW 61.24.100(3)(c) states:

> This chapter does not preclude any one or more of the following after a trustee's sale under a deed of trust securing a commercial loan executed after June 11, 1998:
>
> . . . .
>
> (c) Subject to this section, an action for a deficiency judgment against a guarantor if the guarantor is timely given the notices under RCW 61.24.042.

RCW 61.24.100(6) provides that the guarantor of a commercial loan shall be liable for a deficiency judgment following a nonjudicial foreclosure sale. RCW 61.24.100(6) states:

> A guarantor granting a deed of trust to secure its guaranty of a commercial loan shall be subject to a deficiency judgment following a trustee's sale under that deed of trust only to the extent stated in subsection (3)(a)(i) of this section. If the deed of trust encumbers the guarantor's principal residence, the guarantor shall be entitled to receive an amount up to the homestead exemption set forth in RCW 6.13.030, without regard to the effect of RCW 6.13.080(2), from the bid at the foreclosure or trustee's sale accepted by the sheriff or trustee prior to the application of the bid to the guarantor's obligation.

But the Deeds of Trust Act gives the guarantor "the right to establish the fair value of the property as of the date of the trustee's sale." RCW 61.24.042. Under RCW 61.24.100(5), "the guarantor may request the court or other appropriate adjudicator to determine . . . the fair value of the property sold at the sale." The deficiency judgment against the guarantor may be reduced if the fair value of the property is greater than the price it sold for. RCW 61.24.100(5). RCW 61.24.100(5) states, in pertinent part:

> In any action against a guarantor following a trustee's sale under a deed of trust securing a commercial loan, the guarantor may request the court or other appropriate adjudicator to determine, or the court or other appropriate adjudicator may in its discretion determine, the fair value of the property

sold at the sale and the deficiency judgment against the guarantor shall be for an amount equal to the sum of the total amount owed to the beneficiary by the guarantor as of the date of the trustee's sale, less the fair value of the property sold at the trustee's sale or the sale price paid at the trustee's sale, whichever is greater, plus interest on the amount of the deficiency from the date of the trustee's sale at the rate provided in the guaranty, the deed of trust, or in any other contracts evidencing the debt secured by the deed of trust, as applicable, and any costs, expenses, and fees that are provided for in any contract evidencing the guarantor's liability for such a judgment. . . . <u>This section is in lieu of any right any guarantor would otherwise have to establish an upset price pursuant to RCW 61.12.060.</u>[6]

The McNaughtons argue that the reference in RCW 61.24.100(5) to "upset price" and RCW 61.12.060 of the Foreclosure of Real Estate Mortgages Act, as well as use of the word "duress" in the definition of "fair value" in RCW 61.24.005(6), means that the factors used to determine an "upset price" under the Foreclosure of Real Estate Mortgages Act should be used to determine "fair value" under the Deeds of Trust Act. We disagree.

Enacted in 1935, RCW 61.12.060 of the Foreclosure of Real Estate Mortgages Act allows the mortgagee to file a foreclosure action in superior court. LAWS OF 1935, ch. 125, § 1. RCW 61.12.060 gives the court the discretion to "take judicial notice of economic conditions, and after a proper hearing, fix a minimum or upset price to which the mortgaged premises must be bid or sold before confirmation of the sale."[7] The Foreclosure of Real Estate Mortgages Act does not define "fair value" or "upset price." But the supreme court in <u>National Bank of Washington v. Equity Investors</u>, 81 Wn.2d

---

[6] (Emphasis added.)

[7] RCW 61.12.060 also states, in pertinent part:

The court may, upon application for the confirmation of a sale, if it has not theretofore fixed an upset price, conduct a hearing, establish the value of the property, and, as a condition to confirmation, require that the fair value of the property be credited upon the foreclosure judgment. If an upset price has been established, the plaintiff may be required to credit this amount upon the judgment as a condition to confirmation. If the fair value as found by the court, when applied to the mortgage debt, discharges it, no deficiency judgment shall be granted.

886, 506 P.2d 20 (1973), identified the factors the court should consider "in determining whether and in what amount an upset price should be prescribed." Nat'l Bank, 81 Wn.2d at 924-26. The court held, in pertinent part:

> Accordingly, where, in the court's sound discretion at a foreclosure or other judicially ordered distress sale, an upset price should be fixed, the next step is to fix the amount. The statute calls not for what the court would determine to be the minimum value, but rather its fair value. As we said in Lee v. Barnes, [61 Wn.2d 581, 586, 379 P.2d 362 (1963),] the court "should assume the position of a competitive bidder determining a fair bid at the time of sale under normal conditions." This means that, in deciding upon fair value at a foreclosure sale, the court may consider the state of the economy and local economic conditions, the usefulness of the property under normal conditions, its potential or future value, the type of property involved, its unique qualities, if any, and any other characteristics and conditions affecting its marketability along with any other factors which such a bidder might consider in determining a fair bid for the mortgaged property.

Nat'l Bank, 81 Wn.2d at 926.[8]

Unlike the Foreclosure of Real Estate Mortgages Act, the Deeds of Trust Act defines "fair value" for purposes of the affirmative defense for a deficiency judgment under RCW 61.24.100(5). RCW 61.24.005(6) defines "fair value" as follows:

> "Fair value" means the value of the property encumbered by a deed of trust that is sold pursuant to a trustee's sale. This value shall be determined by the court or other appropriate adjudicator by reference to the most probable price, as of the date of the trustee's sale, which would be paid in cash or other immediately available funds, after deduction of prior liens and encumbrances with interest to the date of the trustee's sale, for which the property would sell on such date after reasonable exposure in the market under conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgably, and for self-interest, and assuming that neither is under duress.

The plain language of the Deeds of Trust Act makes clear that "fair value" does not mean "upset price." RCW 61.24.100(5) states that the determination of "fair value" for purposes of the Deeds of Trust Act is "in lieu of any right any guarantor would

---

[8] (Emphasis in original.)

otherwise have to establish an upset price pursuant to RCW 61.12.060 prior to a trustee's sale." "In lieu of" means " 'in the place of' " or " 'instead of.' " State v. Murrin, 85 Wn. App. 754, 758, 934 P.2d 728 (1997) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1306 (1969)).

"It is an axiom of statutory interpretation that where a term is defined we will use that definition." United States of Am. v. Hoffman, 154 Wn.2d 730, 741, 116 P.3d 999 (2005). Whereas RCW 61.12.060 permits a court to "take judicial notice of economic conditions," the plain language of the Deeds of Trust Act, RCW 61.24.005(6), defines "fair value" "by reference to the most probable price, as of the date of the trustee's sale, . . . with the buyer and seller each acting prudently, knowledgably, and for self-interest, and assuming that neither is under duress."[9] Contrary to the argument that use of the word "duress" refers to the factors used to determine an "upset price," the phrase "assuming neither is under duress" clearly refers to the buyer and the seller "acting prudently, knowledgably, and for self-interest." RCW 61.24.005(6).

The plain language of RCW 61.24.100(5) expressly places the burden of proof on the McNaughtons to establish the fair value of the property. See Kastanis v. Educ. Emps. Credit Union, 122 Wn.2d 483, 493, 859 P.2d 26 (1993) (the defendant bears the burden of proof "only where it asserts an 'affirmative defense' "); Locke v. City of Seattle, 133 Wn. App. 696, 713, 137 P.3d 52 (2006) ("The burden of proof is . . . placed upon the party asserting the avoidance or affirmative defense.").

The McNaughtons concede, as they must, that they have the burden at trial of producing evidence that "the fair value of the foreclosed property exceeded

---

[9] (Emphasis added.)

15

[Washington Federal]'s (by Horizon) credit bid of $6 million." Nonetheless, the McNaughtons claim that Washington Federal did not meet its burden on summary judgment of establishing "fair value."

On summary judgment, the moving party bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party meets this burden, the burden then shifts to the party with the burden of proof at trial. Young, 112 Wn.2d at 225. If the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " the court should grant summary judgment. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

Here, Washington Federal met its burden on summary judgment by showing that the McNaughtons had produced no evidence establishing the fair value of the property. In opposition to summary judgment, the McNaughtons presented no evidence as to the fair value of the property.

The McNaughtons submitted testimony from Gibbons criticizing the 2009 appraisals. But Gibbons states that he had "no basis for saying" whether the $6 million credit bid represented the fair value of the property. Gibbons also admitted that his opinion of the fair value of the property was based solely on his "preliminary review" of Washington Federal's appraisals, and that in order to provide a final opinion, he would need to conduct his own analysis. In his declaration, Mark McNaughton also does not give an opinion as to the "fair value" of the Sommerwood or King's Corner properties at the time of the nonjudicial foreclosure sale. Because the McNaughtons did not present

evidence of the "fair value" of the property, the court did not err in granting Washington Federal's motion for summary judgment.[10]

In the alternative, the McNaughtons contend there are genuine issues of material fact as to the value of the properties at the time of the nonjudicial foreclosure sale. The McNaughtons rely on internal Horizon Bank documents stating the estimated value of the sewer lift station is $3 million, appraisals for two other properties with higher per-lot values,[11] and the sale of Bear Creek Highlands.

We review summary judgment de novo. Tiffany Family Trust Corp. v. City of Kent, 155 Wn.2d 225, 230, 119 P.3d 325 (2005). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. CR 56(c). The nonmoving party may not rely on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (citing CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988)).

There is no dispute that the 2009 and 2010 appraisals for the Sommerwood property do not include the value of the sewer lift. Both appraisals state that experts should be "consulted to determine the value [of the sewer lift station] for not only the subject but for other nearby plats via latecomer fees, etc." The McNaughtons rely on three internal Horizon Bank memoranda dated August 17, August 28, and September

---

[10] The McNaughtons' reliance on cases like Balise v. Underwood, 62 Wn.2d 195, 381 P.2d 966 (1963); Riley v. Andres, 107 Wn. App. 391, 27 P.3d 618 (2001); and Powell v. Viking Insurance Co., 44 Wn. App. 495, 722 P.2d 1343 (1986), to argue that summary judgment is not appropriate where an issue of credibility exists as to a material fact, is misplaced. Unlike in those cases where there is no contradictory evidence as to a material issue of fact, here, there is an absence of evidence.

[11] Mark McNaughton attached three appraisals to his declaration in opposition to summary judgment but the McNaughtons discuss only two of the appraisals on appeal.

23, 2009 to argue there are material issues of fact as to valuation and the bid of $6 million at the nonjudicial foreclosure. The Horizon Bank memoranda set forth an appraised value of $4,115,000 for the Sommerwood property and $930,000 for the King's Corner property, with a combined total of $5,045,000. The memoranda then add an additional estimated value of $3 million for the sewer lift station less $60,000 "for legal and miscellaneous expenses." The Horizon Bank memoranda do not create a material issue of fact. The undisputed record establishes that on February 26, 2009, well before the nonjudicial foreclosure, TMG entered into a bill of sale transferring the facilities, including the sewer lift, to the District. After the nonjudicial foreclosure sale on September 18, 2009, TMG and the District then entered into the Latecomers Agreement to reimburse TMG for the cost of constructing the sewer facilities.

The two appraisals Mark McNaughton submitted in opposition to summary judgment also do not establish the existence of a genuine issue of material fact. Mark McNaughton attaches appraisals for two other properties to his declaration that he asserts are "comparable" and demonstrate the value of the property is greater than the sale price. But Mark McNaughton does not explain why the sale of the two other properties are comparable. The appraisals show that the two properties differ from Sommerwood and King's Corner in total acreage, proposed number of lots, and proposed average lot size. Likewise, Mark McNaughton contends that the 2009 Sommerwood appraisal is flawed because it failed to consider the Bear Creek Highlands sale. But again, the McNaughtons present no evidence that the sale was comparable or rebut the testimony of Washington Federal's appraiser Bryan that Bear

Creek Highlands was not a comparable sale because it was not intended for residential development.

We affirm the decision on summary judgment and entry of the judgment against the McNaughtons.

WE CONCUR: